UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MARK McCONNELL,

                     Plaintiff,

     v.

SWIFTY TRANSPORTATION, INC.
and SWIFTY OIL CO., INC.,

                     Defendants.

**Case No. 2:04-cv-0153**

**JUDGE GREGORY L. FROST**
**Magistrate Judge Abel**

## OPINION AND ORDER

The Court considers this matter pursuant to a motion for summary judgment filed by Defendants Swifty Transportation ("Swifty Transportation") and Swifty Oil Company, Inc. ("Swifty Oil").  (Doc. # 33).  Plaintiff Mark McConnell ("McConnell") filed a memorandum in opposition (Doc. # 39), to which the Defendants replied (Doc. # 43). For the following reasons, the Court **GRANTS** Defendants' summary judgment motion in part and **DENIES** it in part.

## BACKGROUND

McConnell is an Ohio resident.  (Doc. # 26 at ¶ 1).  Defendants are Indiana corporations with their principal place of business in Indiana.  *Id.* at ¶ 2.  Defendants are licensed to conduct business in Ohio.  *Id.*

Swifty Oil Company hired McConnell in 1987 as a driver of a gasoline truck. *Id.* at ¶ 8; McConnell Dep. 17-19.  McConnell transported gasoline to individual service stations that Defendants owned and operated in Ohio.  *Id.* at ¶ 8.  In 1990, an inactive corporation called Swifty Farms, Inc., had its name changed to Swifty Transportation. (Doc. # 33 at 3).  In 1991, McConnell was transferred to Swifty Transportation. (Klinger Decl. at ¶ 6).

1

During his sixteen (16) years with Swifty Transportation, McConnell held the position of lead driver. (Doc. # 26 at ¶ 2).  In that position, McConnell oversaw two other drivers, completed payroll, mileage forms, and time sheets and did some dispatching. (McConnell Dep. 26-30, 84; Stevens Dep. 33).  He also made sure that the truck carried the proper permits and received the proper maintenance.  (McConnell Dep. 22-29).  McConnell was scheduled to work Monday - Friday, twelve hours a day.  *Id.*  When he was not working, McConnell was on-call to respond to the other two drivers' problems.  *Id.* at 22-23.

McConnell reported to two individuals.  (McConnell Apr. 9, 2005 Aff. at ¶ 6).  Lesli Stevens ("Stevens") was Swifty Transportation's transport coordinator and one of McConnell's supervisors.  (Stevens Dep. 9-10, 14, 27).  Stevens provided McConnell with daily dispatching instructions.  *Id.*  McConnell also reported to Pat Adamson ("Adamson"), who was Swifty Transportation's traffic manager.  (Adamson Dep. Vol. I at 7, 64; Vol. II at 78).   In turn, Stevens and Adamson both reported to Don Smith.  (Stevens Dep. 17; Adamson Dep. Vol. I at 8).

In early to mid 2003, McConnell was having difficulty sleeping and concentrating. (McConnell Dep. 60-67).  In order to relieve some stress, McConnell and Swifty agreed to change McConnell's schedule to twelve (12) hour shifts Monday through Thursday.  *Id.* at 60; McConnell Apr. 9, 2005 Aff. at ¶¶ 7, 8.  McConnell worked this modified schedule for three weeks. *Id.* at ¶ 8.

On May 22, 2003, Dr. Ryan ("Ryan"), McConnell's physician, diagnosed McConnell with acute stress reaction.  (McConnell Dep. Ex. 6).  McConnell's stress caused him to have trouble sleeping and to experience concentration lapses.  *Id.* at 61, 67.  Ryan prescribed an anti-depressant for McConnell and placed him on medical leave for two weeks, starting on May 26, 2003 and ending June 9, 2003.  *Id.* at 168; Exs. 5-6; Adamson Dep. Vol. II at 26.  While on

2

leave, McConnell could do anything but work. (McConnell Dep. at 72).

Ryan later extended McConnell's leave for an additional week and, on June 13, 2003,  he reexamined McConnell.  (Ryan Dep. 32-40).  At that time, Ryan found that McConnell was exhibiting more symptoms and that his condition had worsened.  *Id.* at 32-40.   Because of this, Ryan extended McConnell's leave for two months, through August 13, 2003, and prescribed additional medication for him.  *Id.*

When Ryan initially ordered McConnell to take leave, he applied for, and received, leave from work due to his stress.  (McConnell Dep. 84).  McConnell claims that shortly after he went on leave, Stevens and Chris Carson, a driver for Defendants, repeatedly called him at home with work-related questions.  *Id.* at 108-110.  Stevens denies calling McConnell while he was on leave.  (Stevens Dep. 52-54).  The calls stopped, however, when McConnell asked Stevens not to let anyone from work contact him while he was on leave.  (*See* McConnell Dep. 109).

Additionally, Adamson called McConnell while he was on leave to see if he was free for lunch.  (McConnell Dep. 99, 103).  McConnell said that he was, and Adamson drove to a restaurant close to McConnell's home to meet him.  *Id.*  At the lunch, Adamson inquired about McConnell's health and the two discussed the marital problems McConnell was experiencing. *Id.* at 103, 105.  Adamson did not tell McConnell that he was expected to return to work by a certain date.  *Id.* at 105.  After the lunch, Adamson met with McConnell at a gas station.  *Id.* at 111.  McConnell told Adamson he was doing better at that meeting.  *Id.* at 112.

On May 30, 2003, McConnell completed and submitted an application for short-term disability benefits.  (Bridget Smith Dep. 25, 27).  On June 16, 2003, Defendants' benefits coordinator, Bridget Smith, reviewed McConnell's application after receiving all required information from Ryan.  *Id.* at 29-31, 94-96; McConnell Dep. 122-24.  Upon review, Ms. Smith

3

notified McConnell that the application was incomplete due to a failure to sign the medical release provision. *Id.* McConnell immediately corrected the problem and returned the application to Ms. Smith on June 16, 2003.

Jefferson Pilot Life Insurance Company was the short-term disability benefits provider for employees of Swifty Oil and Swifty Transportation. Evonne McHugh ("McHugh") was the Jefferson Pilot claims representative assigned to McConnell's application. (McHugh Dep. 10-11, 13, 21). After reviewing McConnell's application and medical records, McHugh sent McConnell a letter stating that McConnell's request for short-term disability benefits through June 26, 2003 had been granted, but that benefits after that time were denied. *Id.* at 54; McConnell Dep. Ex. 13. The letter to McConnell explained that there was a lack of medical documentation to establish that his condition was severe enough to render him totally disabled beyond June 26, 2003. McConnell Dep. Ex. 13.

On July 22, 2003, McHugh telephoned McConnell to inform him of Jefferson Pilot's decision. (McHugh Dep. at 55-64; McHugh Dep. Exs. 110-11). During the conversation, McConnell informed McHugh that the medical documentation she needed was either laying on either her desk or someone's desk at Swifty Transportation. *Id*. at 56, 63; McConnell Dep. 136-137. According to McHugh, McConnell became "meaner" and "more and more upset" as the conversation continued. McHugh Dep. 63; McConnell Dep. 142. McHugh's notes of her conversation with McConnell indicate that McConnell told her that he "wished he could pay his doctor to release him [to return to work] as he drove [sic] a gas tanker truck and would personally come pay me a visit." (McHugh Dep. Ex. 111). McHugh told McConnell she would document that comment because it was of a "threatening nature." *Id.* McConnell denies making such a statement. (McConnell Dep. 140-41).

4

Shortly after completing her telephone call with McConnell, McHugh contacted her supervisor to report the threat. (McHugh Dep. 59).   Her supervisor then contacted Jefferson Pilot security personnel. *Id.*  Approximately fifteen (15) minutes after her conversation with McConnell, McHugh contacted Bridget Smith at Swifty.  *Id.* at 67-68; Bridget Smith Dep. 60-61.  She informed Ms. Smith about Jefferson Pilot's partial denial of McConnell's application. *Id.*  She also told Ms. Smith that when she informed McConnell about the partial denial he became upset and agitated.  *Id.*  McHugh then began crying and said that when she spoke with McConnell, he had threatened to come pay her a visit. (Bridget Smith Dep. 61-62, 65; McHugh Dep. 66, Ex. 112).

After completing her call with McHugh, Ms. Smith contacted Don Smith and reported McHugh's complaint. (Bridget Smith Dep. 66-67).  Within minutes, Mr. Smith contacted McHugh, expressed his apologies, and informed her that she would not have to worry about McConnell because he would no longer be an employee of the company. (Don Smith Decl. ¶¶ 1-3; McHugh Dep. 69-72).

The next day, Mr. Smith contacted Adamson. (Don Smith Decl. ¶ 8; Adamson Dep. Vol. II at 63).  He advised Adamson that McHugh told him that McConnell had threatened her. (Adamson Dep. Vol. II at 64).  Mr. Smith instructed Adamson to investigate the allegation further and terminate McConnell if McHugh's claim was verified by McConnell.  (D. Smith Decl. ¶¶ 7-8; Adamson Dep. Vol. II at 64-65).

Adamson contacted McConnell via telephone and spoke with him about his earlier conversation with McHugh. (Adamson Dep. Vol. II at 67-70; McConnell Dep. 133-34).   There is disagreement between those two as to whether McConnell admitted to making the alleged

5

threatening statement; however, both parties agree that during that conversation Adamson terminated McConnell's employment with Defendants. *Id.*

## PROCEDURAL HISTORY

On January 13, 2004, McConnell filed suit against Swifty Oil and Swifty Transportation in the Court of Common Pleas for Franklin County, Ohio. McConnell's original complaint alleged state claims of age discrimination, disability discrimination, and public policy tort as well as federal violations of Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*[1] Defendants removed the action to this Court on February 25, 2004. (Doc. # 1).

McConnell's Second Amended Complaint asserts claims under the FMLA, Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1104(a)(1). (Doc. # 26). McConnell also asserts state claims for disability discrimination under Ohio Rev. Code Chapter 4112 and wrongful discharge in violation of public policy. *Id.*

Defendants move for summary judgment on all of McConnell's claims. The Court now turns to an examination of that motion.

---

[1] McConnell's FLSA claim was dismissed pursuant to the Court's July 19, 2005 Order. (Doc. # 50).

6

## STANDARD OF REVIEW

The procedure for considering whether summary judgment is appropriate is set forth in

Federal Rule of Civil Procedure 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories and admissions on file, together
> with the affidavits, if any, show that there is not genuine issue as to any
> material fact and that the moving party is entitled to judgment as a matter
> of law.  The evidence must be viewed in the light most favorable to the
> nonmoving party.

*Adickes v. Kress & Co.,* 398 U.S. 144, 158-159 (1970).  Summary judgment will not lie if the

dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

248, (1986).  Summary judgment is appropriate however, if the opposing party fails to make a

showing sufficient to establish the existence of an element essential to that party's case and on

which that party will bear the burden of proof trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322,

(1986); *see also Matsuchita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574

(1986).

Additionally, in responding to a  summary judgment motion, the nonmoving party

"cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed

fact, but must 'present affirmative evidence in order to defeat a properly supported motion for

summary judgment.'" *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257).  The nonmoving party must

adduce more than a mere scintilla of evidence in order to overcome the summary judgment

motion.  *Id.*  It is not sufficient for the nonmoving party to merely "'show that there is some

metaphysical doubt as to the material facts.'" *Id.*  (quoting *Matsushita*, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it

7

is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## DISCUSSION

### I. FMLA Claim

In his Second Amended Complaint, McConnell alleges two separate violations of the FMLA. Count II alleges that Swifty interfered with McConnell's leave by repeatedly contacting him with work-related questions while he was on FMLA leave.[2] (Doc. # 26 at ¶ 39). Count IV alleges that Defendants' termination of McConnell was, in whole or in part, in retaliation for McConnell's request for FMLA leave. *Id.* at ¶ 53.

Swifty Transportation employs less than fifty (50) employees which is the statutorily assigned minimum number of employees required before an FMLA claim can be brought. Swifty Oil, on the other hand, has hundreds of employees. Therefore, in bringing his FMLA claims, McConnell relies on the "integrated enterprise test," which, if satisfied, would permit him to assert his FMLA claims against the Defendants. To satisfy this test, McConnell asserts that Swifty Oil and Swifty Transportation should be considered a single employer for purposes of bringing an FMLA claim because of the interrelation between the two companies.

---

[2] McConnell's Second Amended Complaint does not assert an interference claim based on Defendants' alleged delay in processing his short-term disability benefit application. (Doc. # 26 at ¶ 39). His response in opposition does raise that argument. (Doc. # 39 at 30-31). Because Defendants responded to that argument in their reply, and failed to mention that the "claim" was not asserted in the Second Amended Complaint, the Court will address the alleged delay as part of McConnell's FMLA interference claim. (Doc. # 43 at 12).

### A.       Integrated Enterprise Test

Under the integrated enterprise test, companies may be considered so interrelated that they constitute a single employer.  *See Radio & Television Broadcast Technicians Local 1264 v. Broadcast Serv. of Mobile, Inc.,* 380 U.S. 255, 85 S. Ct. 876 (1965).  In determining whether two or more companies operate as a single employer, the Court assesses the degree of (1) interrelated operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership.  *Armbruster v. Quinn,* 711 F.2d 1332 (6th Cir. 1983).  Control over the elements of labor relations is a central concern.  *Id.* at 1337.  However, the presence or absence of any one factor is not conclusive.  *Id.* at 1338.  Even when no evidence of common control over labor relations exists, the circumstances may be such that the single-employer doctrine is still applicable.  *Id.*  The Court will proceed to evaluate the relationship between Swifty Oil and Swifty Transportation in a light most favorable to McConnell.  *Id.*

### 1. Interrelated Operations

McConnell has established that there is some interrelation of operations between Swifty Oil and Swifty Transportation.  To begin, Swifty Oil and Swifty Transportation share a work force.  For instance, the two companies share an administrative staff.  Moreover, certain management-level employees work in separate departments of each company.  In addition to a shared work force, Swifty Oil administers and provides all payroll and benefit functions for Swifty Transportation for a fee.  Additionally, Swifty Transportation and Swifty Oil share the same corporate headquarters, telephone number, and fax number.  These facts favor a finding that the companies are interrelated.  *Id.* (noting an interrelation of operations when two companies used the same work force and handled each other's payroll); *McKenzie v. Davenport-Harris Funeral Home,* 834 F.2d 930, 933-934 (11th Cir. 1987)(finding that operations of parent

9

were interrelated with those of subsidiary when parent issued paychecks for subsidiary); *Schubert v. Bethesda Health Group, Inc.,* 319 F. Supp.2d 963, 967 (E.D. Mo. 2004)(finding interrelationship of operations where employees can transfer between companies and where one company handles the payroll for the other company).

### 2. Common Management

In 2003, Swifty Oil and Swifty Transportation shared identical boards and virtually identical officers. At that time, all of Swifty Transportation's officers were officers of Swifty Oil. The meetings of the boards of directors for both companies were historically conducted together, with Swifty Oil's directors giving input and directions as to the operations of Swifty Transportation. Both Swifty Oil and Swifty Transportation have their principal place of business at the same location. Accordingly, these factors support the assertion that Swifty Oil and Swifty Transportation are integrated employers under FMLA. *Mastell Trailer Corporation v. NLRB,* 682 F.2d 753, 755 (8th Cir. 1982)(holding that separate companies are treated as a single employer where they shared common management and offices); *Sheidecker v. Arvig Enterprises, Inc.,* 122 F. Supp.2d 1031, 1038 (D. Minn. 2000)(holding that separate companies are treated as a single employer where they shared common management and board membership); *Baker v. Stuart Broadcasting Co.,* 560 F.2d 389, 392 (8th Cir. 1977)(common management found where parent and subsidiary had same officers and directors); *Schubert,* 319 F. Supp.2d at 967 (finding common officers, board, and offices supports assertion that companies are integrated employers under FMLA).

### 3. Centralized Control Over Labor Relations

There is some evidence that Swifty Oil maintained centralized control over the labor relations of Swifty Transportation. As proof of this, McConnell points to the numerous

10

management level employees serving dual roles within Swifty Oil and Swifty Transportation as well as the identical boards of directors and nearly identical corporate officers.  He also directs the Court's attention to the fact that Adamson, a Swifty Transportation manager, filled out a Swifty Oil employment application when applying for the Traffic Manager position at Swifty Transportation. Donald Smith, President of Swifty Transportation and Vice President of Real Estate and Construction for Swifty Oil, and Swifty Oil CEO and President Don W. Myers, both authorized Adamson's hiring.  Additionally, Adamson's Federal Employment Eligibility Verfication Form I-9 designates his employer as Swifty Oil.  These factors entitle McConnell to an inference that Defendants had centralized control over labor relations.  *Armbruster,* 711 F.2d at 1338-1339.

On the other hand, the record reveals evidence showing that the two Defendants did not have centralized control over labor relations.  For instance, there is little other evidence to show that Swifty Oil had the power to hire, fire or supervise Swifty Transportation employees.  There is nothing in the record to show that Swifty Oil was involved in typical day-to-day employment decisions regarding Swifty Transportation employees. *See Frank v. U.S. West, Inc.,* 3 F.3d 1332, 1363 (10th Cir. 1993)("To satisfy the control prong, a parent corporation must control day-to-day employment decisions of subsidiary.").  Additionally, there is nothing to indicate that McConnell's termination required the approval of Swifty Oil.  It is also unclear whether, at the time Adamson was approved for employment with Swifty Transportation,  Myers was acting as an officer of Swifty Transportation or as an officer of Swifty Oil.

### 4. Common Ownership

The evidence shows that Donald W. Myers, Sr. is the sole owner and shareholder of Swifty Transportation.  Myers also owns 74.5%, or 4,812 shares, of Swifty Oil's stock.  Dana

Myers, Donald's wife, owns an additional 364 shares of Swifty Oil stock. In addition, in May 2001, Dana and Donald's shares in Swifty Oil were the only voting shares of stock. Moreover, as noted above, at the time of McConnell's termination, Swifty Oil and Swifty Transportation had identical boards and nearly identical officers. This evidence weighs in favor of finding that McConnell has satisfied the common ownership factor. *Armbruster*, 711 F.2d at 1338.

Viewing the evidence in a light most favorable to McConnell, the Court holds that there is enough evidence presented to create a genuine issue of material fact as to whether Swifty Oil and Swifty Transportation are integrated employers for the purposes of the FMLA. *Sedlacek v. Hack,* 752 F.2d 333, 334-336 (8th Cir. 1985)(holding that two companies that shared employees, management, equipment, location and employee benefits programs, in addition to near total common ownership, produces the "substantial identity" needed to consolidate for FMLA counting purposes). Consequently, for purposes of this motion only, the Court will assume that the Defendants are integrated employers and will proceed to analyze McConnell's FMLA claims.

**B.      FMLA Interference Claim**

The FMLA entitles qualifying employees to 12 weeks of unpaid leave if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA establishes that employers may not interfere with, restrain, deny the exercise of, or deny the attempt to, exercise any right provided under the FMLA. 29 U.S.C. § 2615(a)(1).

Defendants do not dispute that McConnell had a "serious health condition" that rendered him unable to perform his job as a lead driver. Thus, in order for McConnell to prevail on his interference claim he must establish that: (1) he was an eligible employee; (2) Defendants were

12

an employer; (3) he was entitled to leave under the FMLA; (4) he gave the employer notice of his intention to take leave; and (5) Defendants denied him the FMLA benefits to which he was entitled. *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). Here, the benefit McConnell sought was reinstatement upon return from leave.

Initially, Defendants contend that McConnell's interference claims fail because they are not employers within the meaning of the FMLA, McConnell was not entitled to FMLA benefits, and accordingly that they did not deny him the benefit to which he was entitled. (Doc. # 33 at 16, 17, 22). To support their arguments, Defendants assert that McConnell was not entitled to FMLA benefits because he would not have been able to return to work until after his leave expired. (Doc. # 33 at 17, 22). Defendants rely on *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 784-85 (6th Cir. 1998), for the proposition that an employee has no FMLA claim if he would have been unable to return to work within the 12-week period of leave even if the discharge occurred during that period. (Doc. # 43 at 10-12).

To begin, the Court holds that Defendants' reliance on *Cehrs* is misplaced because the facts are easily distinguished from the case at bar. In *Cehrs*, it was undisputed that the plaintiff could not return to work before the expiration of her FMLA leave. In the present case, however, there is a factual dispute as to when McConnell could have returned to work. McConnell says that he could have returned to work before his leave expired; Ryan says that McConnell could not have returned until November 13, 2003, long after the twelve-week period had ended. (Ryan Dep. 94-95). As such, a genuine issue of material fact exists as to when McConnell could have returned to work.

13

### 1.     Defendants' contacts with McConnell during his leave

McConnell additionally contends that Defendants interfered with his FMLA leave because Stevens and Carson called and asked him to perform work-related tasks and Adamson visited with him twice while he was on leave.   (McConnell Dep. 95-112).  Stevens denies calling McConnell while he was on leave, but Defendants do not dispute that Carson called him while he was on leave with work-related questions.  Nor do defendants dispute that Adamson meet with McConnell twice during McConnell's leave.

Regarding the calls and visits, Defendants rely on *Dodgens v. Kent Mfg. Co.*, 955 F. Supp. 560, 564 (D. S.C. 1997),  to show that the contacts are insufficient as a matter of law to state an interference claim.  Defendants' reliance on *Dodgens* is misplaced, however, as the *Dodgens* plaintiff was not asked to work while on leave -  rather, he was asked to take a demotion upon returning to work.  Instead, the Court finds the factual scenario in *Arban v. West Publishing Corp.,* 345 F.3d 390 (6th Cir. 2003), to be instructive.   In *Arban*, the plaintiff was asked to perform work-related tasks while he was on medical leave and the Court found that interfered with his rights under the FMLA.  *Id.* at 402-406.  Similarly, in the present case, while Defendants' admit that Adamson met with McConnell during his leave, there is a genuine issue of fact about whether Stevens contacted McConnell to ask him if he would perform work-related tasks during the first two weeks of his FMLA leave.  (Stevens Dep. 52-54).  Consequently, the Court concludes that there is a genuine issue of material fact as to whether Defendants alleged contacts with McConnell during his leave interfered with his FMLA rights and therefore **DENIES** Defendants' motion for summary judgment based on McConnell's harassing contacts interference argument.

14

### 2.  Alleged delay in processing benefits application

The second prong of McConnell's interference argument is that Defendants interfered with his FMLA rights by delaying the processing of his application for short-term disability benefits. (Doc. # 14 at 30-31).  Defendants assert that Ryan and McConnell, not Defendants, delayed the processing of the application.  (Doc. # 43 at 12).

The record establishes that Defendants are correct.  McConnell applied for short-term disability benefits on May 30, 2003.  Ryan failed to provide the necessary physician's certification until June 16, 2003.  (Ryan Dep. 63-64; Ryan Dep. Ex. 127).  Additionally, McConnell himself failed to sign the release on the application, even though the application stated that failure to do so would delay the processing of the application.  (McConnell Dep. 120-121).

McConnell also claims that Defendants falsely informed Jefferson Pilot that he had a job while he was on leave.  If McConnell did work while on leave, he would not be entitled to the benefits for which he applied.  Defendants contend that Seth Wooten, ("Wooten") a driver for Defendants, told them that McConnell had another job.  (Bridget Smith Dep. 34-35; Stevens Dep. 63-64).  In contrast, Wooten's affidavit states that he did not so inform Defendants. (Wooten Aff. ¶ ¶ 7, 8).  A question of fact therefore exists as to whether Wooten told Defendants that McConnell was working while on leave.

But, even assuming that Wooten did not say that McConnell was working while on leave, Defendants' investigation of McConnell's employment status during his leave did not delay the processing of his application.  Jefferson Pilot continued to process McConnell's application while the work situation was investigated.  (McHugh Dep. 32-35, McHugh Dep. Exs. 103-104). Of course, the July 4 holiday weekend and McHugh's pre-planned vacation day on July 7 caused

15

a slight delay in the processing of McConnell's application.  But the holiday undoubtedly caused a delay for all of the other pending applications.  Defendants' motion for summary judgment on this "claim"[3] is **GRANTED**.

### C.    FMLA Retaliatory Discharge Claim

Next, McConnell asserts that Defendants terminated his employment in retaliation for his taking FMLA leave.  (Doc. # 26 at ¶ ¶ 39, 40).  Because there is no direct evidence of that assertion, McConnell must first establish a *prima facie* case of retaliation utilizing indirect evidence.  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *see also Skrjanc v. Great Lakes Power Services , Co.,* 272 F.3d 309, 315 (6th Cir. 2001)(adopting *McDonnell Douglas* framework for FMLA case relying on indirect evidence).  If McConnell establishes his *prima facie* case, the burden shifts to Defendants to present a legitimate, nondiscriminatory reason for McConnell's termination.  *McDonnell,* 411 U.S. at 802-04.  Should Defendants do so, the burden then returns to McConnell to establish that the Defendants' articulated reason is in reality a pretext. *McDonnell,* 411 U.S. at 804-806.

### 1.    McConnell's *prima facie* case

To establish a *prima facie* case of retaliatory discharge, McConnell must prove that: (1) he availed himself of a protected right under the FMLA by notifying Swifty of his intent to take leave, (2) he was adversely affected by an employment decision, and (3) there is a causal connection between the protected activity and the adverse employment action.  *See Skrjanc,* 272 F.3d at 314; *see also Canitia v. Yellow Freight Sys., Inc.,* 903 F.2d 1064, 1066 (6th Cir. 1990)(listing the elements of a *prima facie* case for a retaliatory discharge claim).  It is important to note that a plaintiff's burden in establishing a *prima facie* case is not intended to be an

---

[3] *See* note 2, *supra*.

onerous one.  *Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862, 870 (6th Cir. 2001).

McConnell has succeeded in proving a *prima facie* case of retaliatory discharge.  There is no dispute that McConnell was diagnosed with a "serious health condition" and ordered by his doctor to take leave.  It is also undisputed that upon receiving this order from his doctor, McConnell notified Swifty of his intention to take FMLA leave.  Defendants' decision to terminate McConnell left him without employment; therefore, McConnell was adversely affected by Defendants' employment decision.

The proximity in time between McConnell's request for leave and his termination can serve as indirect evidence of a casual relationship between the exercise of a right under the FMLA and the adverse employment action.  *Skrjanc v. Grate Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).  McConnell's leave began on May 25, 2003 and lasted until August 11, 2003. (McConnell Dep. 116-118).  Defendants terminated his employment on July 23, 2003.  *Id.* The proximity in time between FMLA leave and McConnell's discharge - two months - is sufficient to establish a causal link for the purposes of meeting the low threshold of establishing a *prima facie* case.  *Skrjanc,* 272 F.3d at 314.   McConnell's discharge while on FMLA leave provides at least some inference of intentional prohibited activity.  *See Humphreys v. Bellaire Corporation,* 966 F.2d 1037, 1044 (6th Cir. 1992)(finding an inference of intentional prohibited activity where employee was discharged two months before pension was vested).

### 2.  Defendants' Proffered Legitimate, Nondiscriminatory Reason for Termination

Defendants, in turn, have succeeded in coming forth with a legitimate, nondiscriminatory reason for McConnell's discharge.  Defendants posit that they had an honestly held belief that McConnell threatened McHugh and that the threat involved the use of one of Defendants' tanker

trucks. This explanation is supported by the testimony of McHugh, Bridget Smith, and Donald Smith.  (McHugh Dep. 57-59, 62-66; McHugh Dep. Exs. 110, 111; D. Smith Decl. ¶¶ 2, 3; Bridget Smith Dep. 60-61).  Defendants contend that it was the threat in conjunction with concerns over terrorism that prompted McConnell's termination.  Specifically, Defendants' March/April 2003 employee newsletter notified the truck drivers of an attempted high-jacking of a fuel tank truck in Indiana early 2003.  (Decl. Andrew M. McNeil ¶¶ 2, 3; Decl. Pat Adamson ¶ ¶ 2, 3).   Defendants' principal place of business is in Indiana.  (Doc. # 26 at ¶ 2). Moreover, a copy of Defendants' Security Awareness and in-depth Security Training Manual show that Defendants were concerned with the increased risk to carriers of hazardous materials in the wake of the September 11, 2001 terrorist attacks. (Doc. # 26 at ¶ 2).

Accordingly, the Court holds that Defendants have produced a legitimate, non-discriminatory reason for McConnell's discharge.  The burden now shifts to McConnell to show that Defendants' reason is mere pretext.

### 3.      Pretext

McConnell can show pretext by offering evidence that Defendants' proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee.  *Kocsis v. Multi‑Care Management, Inc.*, 97 F.3d 876, 883 (6th Cir. 1996).  In challenging Defendants' action, McConnell "must demonstrate that the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true." *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir.1997).

McConnell argues that Defendants' proffered nondiscriminatory reason for his termination is pretextual for several reasons.  First, he argues that Defendants terminated his employment in part because his FMLA leave caused Defendants to incur additional expenses

18

and liabilities.  Specifically, he argues that while on leave Defendants were forced to hire outside hauling contractors and to pay the other drivers additional overtime to cover his shifts. McConnell contends that Defendants were then subjected to additional liability because its drivers were required to work more hours than allowed by federal law and/or regulations.

The problem in accepting McConnell's "increased costs and potential liabilities" theory is that increased costs and potential liabilities are inherent anytime an employee takes leave from a company.  Companies like Defendants, who operate seven days a week, will always have to fill the void left by an employee who takes leave or even vacation.  To find a showing of pretext based solely on this theory would give any employee who was fired while on leave a free pass to trial.

In other words, McConnell must show something more than the mere fact that Defendants were subjected to increased costs and potential liabilities because of his leave.  That "something more" is a causal link between Defendants' increased costs and the adverse employment action.  To survive the motion for summary judgment, McConnell must come forward with evidence from which a reasonable jury could find that Defendants' desire to avoid increased costs and potential liabilities was a *determining* factor in his discharge.  *See Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 239 (4th Cir. 1991)(finding that plaintiff's claim that defendant discharged him to meet its "financial need" was not enough to prove pretext) (emphasis added).

To satisfy his burden, McConnell offers as the causal link the proximity in time of his termination and the savings to Defendants, which is two months.  This alone is not enough. *Humphreys v. Belleaire Corporation,* 966 F.2d 1037, 1044 (6th Cir. 1992)("[O]nce the employer has presented a separate, legitimate reason for discharge, we do not believe that [monetary]

19

savings and proximity will always be enough to entitle plaintiff to a trial").  Moreover, other employees of Defendants took FMLA leave and were not fired. (Doc. # 43 at 13).  McConnell's first attempt to establish pretext therefore fails.

Second, McConnell offers as proof of pretext the fact that before his FMLA leave he was considered an asset to the company.  He offers proof that Defendants' management thought that he was "very good" at his job.  He also shows that in his sixteen years with Defendants he earned various merit increases.   This evidence in unpersuasive to prove pretext.  Evidence that Swifty considered McConnell to be a good employee only shows that absent some extenuating circumstance they were not likely to terminate his employment.

In his final contention of pretext, McConnell claims that, due to the short time frame in which Defendant decided to terminate his employment, Defendants' belief that he threatened McHugh could not be "honestly held".  Specifically, he claims that he was terminated on the basis of an unsubstantiated allegation made by an unknown non-employee, without an investigation, with no disciplinary policy addressing the issue, and without obtaining his version of the incident.

An employer may overcome a showing of pretext by demonstrating that its belief was "honestly held" even if wrong.  *Smith v. Chrysler Corporation,* 155 F.3d 799, 807 (6th Cir. 1998).  This can be shown by establishing that the employer reasonably relied on particularized facts that were before them at the time the decision was made. *Id.*  However, even if the employer is able to make such a showing, the protection afforded by the "honest belief" rule is not automatic. *Id.*  If the belief was held in error and that error is too obvious to be unintentional, then there is a strong presumption that the employer had an unlawful motive. *Id.*

In deciding whether an employer reasonably relied on the particularized facts before it,

20

"it is inappropriate for the judiciary to substitute its judgment for that of management." *Smith v. Leggett Wire Co.,* 220 F.3d 752, 763 (6th Cir. 2000). The principal function of the Court is not to second-guess the business judgment of an employer, but rather to determine "whether the employer gave an honest explanation of its behavior." *Hedrick v. Western Reserve Care Sys.,* 355 F.3d 444, 462 (6th Cir. 2004). Therefore, the key inquiry is "whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Chrysler,* 155 F.3d at 808.

The Court concludes that Defendants honestly believed that McConnell threatened McHugh and that their decision to terminate him was reasonably informed and considered. As proof that their belief was honestly held and reasonably informed, Defendants offered the testimony of McHugh, Bridget Smith, Don Smith, and Pat Adamson. In brief, McHugh testified that on July 22, 2003 she had a telephone conversation with McConnell during which he made what she perceived to be a threat. After ending her call with McConnell, McHugh quickly informed her supervisor and then contacted Bridget Smith. Smith testified in her deposition that McHugh was upset and began crying while relaying the conversation she had with McConnell. McHugh's demeanor during her conversation with Bridget Smith was therefore consistent with a threat having been made against her. Shortly after concluding her call with McHugh, Bridget Smith relayed her conversation with McHugh to Don Smith, president of Swifty Transportation. Mr. Smith then quickly contacted McHugh and confirmed the allegation.

McConnell points out that McHugh testified that Mr. Smith told her during that call that McConnell would be fired. (Doc. # 39 at 16 (citing McHugh Dep. 71-72)). Of course, this statement occurred before Mr. Smith had obtained McConnell's version of events. Regardless, Smith took the extra step of having Adamson contact McConnell to get McConnell's version of

the alleged threat.  Adamson testified that on July 23, 2003 he spoke with McConnell on the

phone and during this conversation McConnell admitted to threatening McHugh.  Defendants

contend that they decided to terminate McConnell based on his conversation with Adamson.

McConnell, of course, denies making any admission but did testify in his deposition that he told

McHugh that "he was mad enough that if I could afford it, I would drive my truck to Swifty and

take care of it myself because it was intentionally too long with no money."[4]  (McConnell Dep.

140-41).

        In order to show that Defendants' belief was not reasonably held, McConnell offers two

pieces of evidence.  First, he presents a timeline of the decision to terminate him based on

McHugh's contemporaneous notes of her conversation with McConnell.[5]  According to this

timeline, less than two minutes elapsed from the time Don Smith heard of the threat and the time

the decision was made to terminate McConnell[6].  (Doc. # 39 at 16).  Second, McConnell offers

his denial of the threat and a denial that he admitted to Adamson that he made the alleged

_____

[4] Ryan's records of McConnell's office visits around the time of the call indicate that McConnell
had "excessive anger," "extreme anger," and "rage."  (Ryan's notes from McConnell's June 26,
2003 and July 17, 2003 office visits).

[5] Those notes state that when McHugh called McConnell to tell him about Jefferson Pilot's
decision regarding his short-term disability benefits, he "he became agitated" and "stated he
wished he could pay his doctor to release him to [return to work] as he drove [sic] a gas tanker
truck and would personally come pay me a visit."  (McHugh Dep. Ex. 111).

[6] It is unclear is whether the time stamps used to create the timeline offered are an accurate
reflection of the actual amount of elapsed time; indeed Swifty contends that they are not. Ms.
McHugh has testified that these time stamps only reflect the time a user starts typing the note
into the computer software.  Other than this testimony there is little evidence to show whether
the time stamps are an accurate reflection of the time spent talking with Ms. McHugh.  However,
we will draw all inferences in favor of McConnell and will, therefore, accept that Mr. Smith
made the decision to terminate McConnell within a short period of time.

threat.[7]

Viewing this evidence in a light most favorable to McConnell, the Court holds that McConnell has not produced sufficient evidence to prove that Defendants' belief was not honestly held.  The timeline offered by McConnell shows that Mr. Smith took only two minutes to make his decision.  While a two-minute decision may not seem like sound business judgment, as stated above, it is not for this Court to substitute its own judgment for that of a business.  What the timeline also shows is that Mr. Smith, upon hearing about the threat, contacted McHugh to confirm that a threat was made before making any decisions as to McConnell.

McConnell claims that the decision to fire him was made solely upon this one conversation with McHugh and without first questioning him as to the validity of the claim.  Assuming this is true, that does not mean that Mr. Smith's belief was not honestly held.  Additionally, McConnell does not dispute that Adamson contacted him to get his version of the story - and that he was fired only after Adamson had heard McConnell's version of the "threat."

The Court notes that in order to for an employer to form an honest belief, it is not required that the "decisional process used by the employer be optimal or that it left no stone unturned." *Smith,* 155 F.3d at 807.  Here, in fact, no stone was left unturned - in this "he said,

_____

[7]McConnell offers the affidavit of his second cousin, Steve Winkhaus, to show that he did not make the threat that Defendants attributed to him.  Defendants' object to his affidavit because McConnell failed to identify Winkhaus as a witness during discovery.  (Doc. # 43).  McConnell attempted to cure this deficiency by filing a "Notice to Supplement Initial Disclosures" on April 25, 2005, which was eleven days after he filed his memorandum in opposition to the current motion and well after the discovery deadline had passed.  Defendants were thus unable to depose Winkhaus.  (Doc. # 42).  This Court has refused to consider the affidavit of a witness submitted by a plaintiff in response to a summary judgment motion because the witness was not identified during discovery in violation of Fed. Rs. Civ. P. 26, 37.  *See Black v. Columbus Pub. Sch.*, 124 F. Supp. 2d 550, 561 (S.D. Ohio 2000).  Accordingly, the Court, under the authority of *Black,* will not consider the affidavit of Winkhaus, sustains Defendants' objection,  and **ORDERS** the affidavit stricken from the record.

she said" situation, Defendants did all that they could do - they contacted both the "she" and the "he" for their respective versions of the story.

Moreover, McConnell's bare denials that he never threatened McHugh or that he never admitted to Adamson that he threatened McHugh is also insufficient to prove that Defendants' belief was not honestly held. *See Gribcheck v. Runyon,* 245 F.3d 547, 552 (6th Cir. 2001)("blanket denial [of] the employer's articulated reasons...is not enough; a plaintiff must take the extra step of presenting evidence to show that the reasons given are an attempt to cover up the employer's alleged real discriminatory motive.")(*quoting Irvin v. Airco Carbide,* 837 F.2d 724, 726 (6th Cir.1987)). McConnell must put forth material proof that Mr. Smith did not honestly believe that McConnell threatened McHugh and that this was really just an attempt to cover up Defendants' discriminatory motive.  Showing that the decision was made quickly and denying that a threat or the confirmation of that threat was made is insufficient to prove that Defendants' belief was not honestly formed or to show that their proffered reason is mere pretext.

Consequently, the Court holds that Defendants' decision to terminate McConnell was a reasonably informed and considered decision, and that Defendants honestly believed that McConnell made the threat.  Therefore, the Court **GRANTS** Defendants' motion for summary judgment on McConnell's FMLA retaliatory discharge claim. (Doc. # 33).

## II.  ADA & Ohio Revised Code Disability Claim

In his Second Amended Complaint, McConnell asserts that he is disabled within the meaning of the ADA because he suffers from acute stress reaction, which limits one or more of his major life activities. (Doc. # 26 at ¶ ¶ 47, 76).  Alternatively, McConnell argues that Defendants regarded him as disabled.  *Id.* at ¶ 73. Defendants counter that McConnell was not

24

disabled and that they did not regard him as being disabled.  (Doc. # 33 at 18-21).

A.     **ADA & ORC Chapter 4112 Framework**

"The essential elements of a claim brought under the ADA and the Ohio Rev. Code

Chapter 4112 are the same. Therefore, the case law regarding claims brought under the ADA

applies equally to claims brought under the Ohio statute." *Hoffman v. Fidelity Brokerage Servs.,*

*Inc.*, 959 F. Supp. 452, 457 at n.1 (S.D. Ohio 1997) (citation omitted); *see also City of Columbus*

*Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998) ("The federal [ADA] is

similar to the Ohio handicap discrimination law. . . . We can look to regulations and cases

interpreting the Federal Act for guidance in our interpretation of Ohio law.").  Thus, the Court

will examine Plaintiff's claims under both the state and federal statutes using the same

analysis.  *See Senter v. Hillside Acres Nursing Ctr. of Wllard, Inc*., 335 F. Supp. 2d 836, 844

(S.D. Ohio 2004).

In order to establish a *prima facie* case of discrimination under the ADA, McConnell

must show that: (1) he is disabled; (2) he is otherwise qualified for his previous position with

Defendants, with or without reasonable accommodation; (3) he suffered an adverse employment

decision; (4) Defendants knew or had reason to know of his disability; and (5) he was replaced

or that his position remained open while Defendants looked for other applicants.  *See Plant v.*

*Morton International, Inc.,* 212 F.3d 929, 936 (6th Cir. 2000).  If McConnell succeeds in proving

a *prima facie* case, the burden then shifts to Defendants to provide a nondiscriminatory

explanation for its actions.  *Id*.  Once Defendants have proffered a nondiscriminatory reason for

their actions, McConnell must then come forward with evidence that Defendants' proffered

reason is merely pretextual. *Id.*

### B.    McConnell's *prima facie* case

The ADA defines disability as: 1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; 2) a record of such impairment; or 3) being regarded as having such an impairment.[8]  42 U.S.C. § 12102(2).  However, the ADA fails to define "mental impairment," "substantially limits," and "major life activity," and no agency has been given authority to issue regulations interpreting the term "disability" in the ADA.  *Sutton v. United Air Lines, Inc*., 527 U.S. 471, 479 (1999).   Nevertheless, the Equal Employment Opportunity Commission ("EEOC") has issued regulations defining the three elements of disability.   *See* 29 CFR §§ 1630.2(h)-(j) (2004).  Because the EEOC issued the regulations without authority, their persuasive authority is unclear.  *Toyota Motor Mfg., KY Inc. v. Williams*, 534 U.S. 184, 194 (2002).  Regardless, the Court will utilize the EEOC's regulations as a source of guidance for deciphering those terms because both parties have cited the regulations in their briefs, thereby indicating that the parties believe that the regulations are reasonable and valid.  *Id;  see also Sutton*, 527 U.S. at 480; *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 563, n.10 (1999); *Swanson v. Univ. of Cincinnati and University Hosp. Inc,* 268 F.3d 307, 314 (6th Cir. 2001) (accepting the EEOC's regulations as reasonable when both parties do the same).

Based on the evidence presented, this Court finds that McConnell is not disabled as defined by 42 U.S.C. § 12102(2).  Defendants concede that McConnell's "acute stress reaction" falls within the definition of "mental impairment." *See* 29 C.F.R. § 1630.2(h)(1).  However,

---

[8] Similarly, as used in Ohio Rev. Code § 4112.02, "'disability' means a physical impairment that substantially limits one or more major life activities ... or being regarded as having a physical or mental impairment." Ohio Rev. Code § 4112.01(A)(13).

McConnell has not established that his impairment substantially limited his ability to work, concentrate, and sleep - activities McConnell describes as major life activities.  (Doc. # 39 at 50-54).

Before the Court may determine whether McConnell's acute stress reaction substantially limits those activities, the Court must first examine whether working, concentrating, and sleeping are, as McConnell claims them to be, major life activities.  "Major life activities" means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  29 C.F.R. § 1630.2(I).  The Sixth Circuit has referred to EEOC regulations noting that major life activities constitute tasks central to most people's daily lives, and include "working." *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 337 (6th Cir. 2002); *Swanson*, 268 F.3d at 314 (citing 29 C.F.R. § 1630.2(I) (emphasis added)).  Although merely referring to the EEOC's regulations does not equate to an endorsement, the Sixth Circuit explicitly accepted the EEOC's interpretations as reasonable in *Swanson* when the parties had done the same.  *Swanson*, 268 F.3d at 314.  Consequently, because the parties in the case *sub judice* rely on the EEOC's regulations in their briefs, the Court will therefore assume without deciding that working is a major life activity for purposes of the instant motion.

The Court reaches the opposite conclusion with respect to concentrating, however. Specifically, the Sixth Circuit has held that concentrating is not a major life activity.  *Linser v. Ohio Dep't of Public Health*, 2000 U.S. App. Lexis 25644, * 9 (6th Cir. 2000).  Lastly, McConnell asserts that sleeping is a major life activity. (Doc. # 39 at 50).  The Sixth Circuit agrees.  *Boerst v. Gen. Mills Operations*, 25 Fed. Appx. 403, 406 (6th Cir. 2002).

Hence, the issue of whether his acute stress reaction substantially limits the major life

activities of working and sleeping become central to McConnell's *prima facie* case.

"Substantially limits" is defined as follows:

> (I) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j). The United States Supreme Court has held the terms "substantially limits" and "major life activity" must be "interpreted strictly to create a demanding standard for qualifying as disabled." *Williams*, 534 U.S. 184 at 197. An impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the ADA. *Mahon v. Crowell*, 295 F.3d 585 (6th Cir. 2002).

Moreover, "it is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." *Williams*, 534 U.S. at 198. An individualized case-by-case assessment of the effect of that impairment on the plaintiff's life is required, including the extent of its limitation on a major life activity and the effect of any corrective or mitigating measures taken by the plaintiff. *Williams*, 534 U.S. at 198-99 (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483-84 (1999)); *see also Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999) (disability not based on the diagnosis, but on the effect of that impairment on the life of the individual).

### 1. Working

The Supreme Court has held that, when a plaintiff claims that his disability "substantially limited" his ability to work, he must establish that he is "unable to work in a broad class of jobs." *Sutton,* 527 U.S. at 491; *see also* 29 C.F.R. § 1630.2(j)(3)(I). Simply being precluded from a

28

particular job does not satisfy this requirement. *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523 (1999).  In other words, the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.  *Cannon v. Levi Strauss & Co.*, 29 Fed. Appx. 331, 334 (6th Cir. 2002).

　　While McConnell has produced evidence that he was unable to perform his particular job, there is no evidence to show that he was unable to perform a "broad range of jobs."  (Ryan Dep. Ex. 120).  Melessa Hunt, Ph.D. ("Hunt"), examined McConnell on August 31, 2004, after this litigation began.  (Hunt Dep. Exs. 130, 133).  Hunt was not McConnell's treating physician. *Id.*  According to Hunt, McConnell was "unable to perform each of the main duties of his regular occupation as a tanker driver for [Defendants]."  *Id.*  However, Ryan's medical records for McConnell and Hunt's report are devoid of any indication that McConnell's "acute stress reaction" prevented him from performing a broad range of jobs.  Indeed, the record reveals that McConnell had additional skills above that of being a truck driver.  For example, McConnell served as a lead driver.  He testified that part of his duties as lead driver was to calculate and dispatch loads.  He was also responsible for managing the other drivers, filling out and verifying time sheets, and maintaining the proper records for his truck.  There has been no evidence presented that shows that given these other skills, McConnell was significantly restricted in the major life activity of working.  Moreover, Hunt's report indicated that the medication Ryan prescribed for McConnell, Desyrel and Lexapro, significantly improved McConnell's condition to the point that he was able to re-enter the workforce.  (Hunt Dep. Ex. 133; Ryan Dep. 31).  Given these factors, the Court cannot conclude that McConnell's "acute stress reaction" substantially limited the major life activity of working.  Defendants are therefore entitled to summary judgment on this aspect of McDonnell's ADA and O.R.C. Chapter 4112 claim.

### 2.    Sleeping

McConnell also asserts that his "acute stress reaction" substantially limited the major life activity of sleeping. (Doc. # 39 at 52-54).  His deposition and his medical records contradict that assertion.  For example, McConnell admitted in his deposition that his condition only limited his ability to work during his leave.  (McConnell Dep. 73-75).  The Court notes that McConnell cannot create an issue of fact by contradicting his own deposition.  *See Penny v. United Parcel Servs.*, 128 F.3d 408, 415 (6th Cir. 1997).  Moreover, Ryan's notes indicate that after he prescribed Desyrel and Lexapro for McConnell, McConnell's sleep increased.  (Ryan Dep. 34-36; 41-46; 58-59; 64, 67).  Furthermore, Hunt's report indicates that McConnell's condition improved when he started taking those pharmaceuticals.  (Hunt Dep. Ex. 133). In contrast, Hunt's report fails to state whether McConnell's acute stress reaction caused him to be significantly restricted in his ability to sleep compared to the average person in the general population.  *Swanson,* 268 F.3d at 316; *see also* 29 C.F.R. § 1630.2(j)(1). These factors convince the Court that McConnell was not substantially limited in the major life activity of sleeping.  Consequently, the Court **GRANTS** the Defendants' motion for summary judgment on McConnell's ADA and O.R.C. Chapter 4112 claims as they pertain to the major life activity of sleeping.  (Doc. # 33).

### C.    "Regarded as"

Alternatively, McConnell alleges that he qualifies as disabled because Defendants "regarded him" as being disabled.  (Doc. # 26 ¶ ¶ 46, 73).  However, McConnell waived this claim by not addressing it in his in his memorandum in opposition.  *See Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 153 (6th Cir. 1996).

### D.    Failure to accommodate

McConnell's memorandum in opposition, while failing to address his "regarded as" claim, instead raises another claim; specifically, McConnell argues that Defendants failed to reasonably accommodate him by not granting him a leave of absence from his position with Defendants.  (Doc. # 39 at 59).  In response, Defendants correctly point out that McConnell's failure to plead that claim in his Second Amended Complaint constitutes waiver.  *See Tinch v. City of Dayton*, 1996 U.S. App. LEXIS 5716, at * * 14-15 (6th Cir. 1996) (citing *Purnell v. City of Akron*, 925 F.2d 941 n.6 (6th Cir. 1991)): *see also* Fed. R. Civ. P. 8(a).

For the above reasons, this Court concludes that McConnell has failed to establish a *prima facie* case of discrimination under the ADA and O.R.C. Chapter 4112.  Accordingly, the Court **GRANTS** Defendants' motion for summary judgment on all aspects of those claims.

## III.  ERISA Claim

Count VI of McConnell's Second Amended Complaint asserts that his termination was in whole or in part for pursuing benefits allegedly due to him under ERISA.  McConnell also argues that Defendants interfered with his medical benefits while he was still in their employ.

### A.  McConnell's health benefits

McConnell asserts that Defendants cancelled his health benefits while he was still in their employ in violation of ERISA, 29 U.S.C. § 1132(a)(1)(B).  Based on the evidence, the Court disagrees.

As part of his employment, McConnell received health benefits.  The premiums for these benefits were deducted automatically from McConnell's paycheck.  While McConnell was on leave, he was informed that he would have to continue to pay these premiums in order to keep his health care benefits from lapsing.  On or about July 1, 2003, Defendants contacted

McConnell by mail to inform him that if his premiums were not paid by July 22, 2003 his health benefits would lapse. On July 22, 2003, Ryan mailed in the payment for McConnell's health insurance premium. On July 23, 2003, Defendants discharged McConnell. Defendants ended McConnell's benefits after he was terminated. (Bridget Smith Dep. 43, 97; Ryan Dep. 93, 95-96, 99). There is nothing in the evidence to show that McConnell's health benefits were terminated while he was still employed with Defendants; indeed, McDonnell admitted to Hunt that his benefits were cancelled after his termination. (Hunt Dep. Ex. 133 at 3). As such, the Court **GRANTS** Defendants' motion for summary judgment on McConnell's § 1132 ERISA claim. (Doc. # 33).

### B. McConnell's § 501 Claim

McConnell also argues that his termination was for the purpose of interfering with, or in retaliation for, exercising his right to receive short-term disability benefits in violation Section 510 of ERISA, 29 U.S.C. § 1140. (Doc. # 26 at ¶¶ 68-69). That section states in pertinent part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301, *et seq.*], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter . . .

Title 29 U.S.C. § 1140. In order to state a claim under § 510, a "plaintiff 'must show that [his] employer had a specific intent to violate ERISA.'" *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997). However, because generally there is no direct evidence of an employer's motivation, most courts employ a *Burdine* burden shifting approach in a § 510 case. *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992).

32

To prove a *prima facie* case under § 510 a plaintiff must show that there was: "'(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.'" *Id.* As stated above, in order to show a discharge violated § 510, a plaintiff "must show that an employer had a specific intent to violate ERISA." *Rush v. United Technologies, Otis Elevator Div.*, 930 F.2d 453, 457 (6th Cir. 1991). The plaintiff is not required to show that the employer's sole purpose in discharging him was to interfere with his pension benefits, but rather it was a "motivating factor" in the decision.

If the plaintiff establishes a *prima facie* case under § 510, the employer can rebut the presumption of impermissible action created by the *prima facie* case by introducing "'evidence of a legitimate, nondiscriminatory reason for its challenged action.'" *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997)(citing *Humphreys*, 966 F.2d at 1043). Once the employee has satisfied its burden of production by introducing evidence of a legitimate, nondiscriminatory reason for its action, the burden then shifts back to the plaintiff to show that the employee's proffered reason was mere pretext for purposeful interference with the plaintiff's ERISA rights. *Id.* In establishing pretext, the plaintiff is not required to show that the employee's sole purpose was to interfere with plaintiff's entitlement to ERISA benefits. *Smith*, 129 F.3d at 865 (citing *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1411 (6th Cir. 1996)). Rather, the employee must "'either prove that the interference was a motivating factor in the employer's actions or prove that [the] employer's proffered reason is unworthy of credence.'" *Smith*, 129 F.3d at 865 (quoting *Shahid*, 76 F.3d at 1411)(quoting *Humphreys*, 966 F.2d at 1043). Finally, despite the shifting burdens of production, the plaintiff retains the burden of persuasion throughout the action on the ultimate issue; namely, that he has been the victim of purposeful interference with his ERISA rights.

33

To begin, McConnell contends that Defendants had a motive to retaliate and interfere with his short term disability benefits because (1) they were short staffed; (2) McConnell's replacement was inexperienced; (3) Defendants were paying outside carriers; and (4) McConnell's disability leave was extended beyond the original two week period. McConnell's hypothesizing about possible motives Defendants had does not establish that McConnell's pursuing his short-term disability benefit application was a "motivating factor" in their decision to terminate him. Nor does McConnell's hypothesis show that Defendants interfered with his application. Rather, the record establishes that Defendants aided McConnell in various stages of the short term disability application process. Specifically, Defendants sent McConnell the appropriate paperwork, collected the appropriate materials from his doctor, reviewed the application, and sent the paperwork to Jefferson Pilot. (Bridget Smith Dep. 37-40, 42-46). At one point during the application process, Defendants returned a portion of the paperwork to McConnell that needed his signature. (McConnell Dep. 122-125; McConnell Dep. Exs. 8, 9; Bridget Smith Dep.29-31, 93-96).

McConnell has failed to produce any evidence that his termination was to interfere with, or in retaliation for, exercising his right to receive short-term disability benefits in violation of Section 510 of ERISA. Thus, McConnell has not established his *prima facie* case and the Court **GRANTS** Defendants' motion for summary judgment on all of McConnell's ERISA claims. (Doc. # 33).

**IV.   Ohio Public Policy Tort Claim**

34

Lastly, McConnell asserts a claim for wrongful discharge in violation of public policy under Ohio law.  (Doc. #  26 at ¶ 57-62).

The elements of the common-law claim of wrongful discharge in violation of Ohio public policy are (1) the existence of a clear public policy manifested in constitutional, statutory regulatory or common law; (2) the circumstances of the discharge undermine or jeopardize the public policy; (3) the discharge was motivated by conduct related to the public policy; and (4) there was no overriding legitimate basis for the discharge. *Kulch v. Structural Fibers, Inc.*,677 N.E.2d 308, 321 (Ohio 1997).

According to the Sixth Circuit, public policy claims necessarily fail where the underlying statutory claims fail.  *Hausler v. GE*, 2005 U.S. App. LEXIS 10983 (6th Cir., 2005) (citing *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 375 (6th Cir. 1999)).  Thus, because the Court granted Defendants' motion for summary judgment on McConnell's claims under the ADA, O.R.C. Chapter 4112 and ERISA, the Court **GRANTS** defendants' motion for summary judgment on the corresponding wrongful discharge claims.  (Doc. # 33).

That leaves McConnell's FMLA wrongful discharge claim. Unfortunately for McConnell, however, the Ohio Supreme Court does not recognize a claim for wrongful discharge in violation of public policy when the alleged discharge is one in violation of the FMLA. *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 2002 Ohio 3994, 773 N.E.2d 526, 533 (Ohio 2002). Accordingly, the Court **GRANTS** Defendants' motion for summary judgment on McConnell's FMLA wrongful discharge claim. (Doc. # 33).

**CONCLUSION**

35

The Court **GRANTS** Defendants' motion for summary judgment regarding McConnell's ADA, O.R.C. Chapter 4112, ERISA, and wrongful discharge in violation of public policy claims. The Court **DENIES** Defendants' motion for summary judgment on McConnell's FMLA interference claim based on Defendants' alleged contacts with McConnell while he was on leave; **GRANTS** Defendants' motion as it pertains to McConnell's FMLA interference claim, to the extent it exists, based on the alleged delay in processing his short-term disability benefit application, and **GRANTS** Defendant's motion on McConnell's FMLA retaliation claim. (Doc. # 33).

**IT IS SO ORDERED.**

     _/s/  **Gregory L. Frost**_____
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**